

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00564-CV

_____

IN THE INTEREST OF J.S., A CHILD

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. 23-11638-362

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant J.S. (Mother) appeals the trial court's order terminating her parental rights to her son, J.S. (Jaden).[1] Mother hired numerous attorneys to represent her during various parts of the case, while she was pro se during other parts. The five-day termination trial started two weeks before the statutory dismissal deadline.[2] Mother began the trial pro se; but during voir dire, an attorney briefly appeared for the first time to represent her, orally requested a continuance, and withdrew. Mother represented herself during the remainder of the trial.[3] In three issues on appeal, Mother argues that (1) the trial court's failure to elicit or obtain her voluntary and written waiver of counsel caused reversible error; (2) she was prejudiced by the trial court's denial of her attorney's oral motion for continuance that was made during

---

[1]To protect his identity, we use an alias to refer to the child, and we will refer to his family members by their relation to him. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. Fam. Code Ann. § 263.401(a) (providing that a trial court's jurisdiction is terminated on the first Monday after the first anniversary of the date the trial court rendered a temporary order appointing the Texas Department of Family and Protective Services as temporary managing conservator).

[3]During trial, the trial court appointed Mother a criminal attorney to represent her in a criminal matter relating to Mother's endangerment of Jaden. That criminal attorney appeared on the last day of trial. Mother, however, continued to represent herself pro se in the termination case.

trial; and (3) the mid-trial filing of an amended[4] affidavit by the Texas Department of Family and Protective Services in support of Jaden's removal constituted fraud, prevented her from properly litigating her case, and caused reversible error.

As to Mother's first issue, we will hold that, based on the record before us, Mother's failure to have representation at trial was due to her own actions and attempt to manipulate the court system; therefore, Mother knowingly and voluntarily waived her right to counsel. As to Mother's second issue, we will hold that the trial court did not abuse its discretion by denying the oral motion for continuance made by her attorney at trial. As to Mother's third issue, we will hold that her complaint regarding the amended affidavit in support of Jaden's removal has been mooted by the entry of the termination order. Accordingly, we will overrule Mother's three issues and affirm the trial court's termination order.

## II. BACKGROUND

### A. Jaden's May 2021 Birth, His March 2023 Seizure and Emergency Room Visit, Mother's Leaving the Hospital with Jaden Against Medical Advice, and the Department's Initial Involvement with Mother

Mother gave birth to Jaden in May 2021.[5] In March 2023—when Jaden was around twenty-two months old—he had a seizure and was taken to the emergency

---

[4]As we will detail below, the affidavit attached to the Department's original petition was seemingly missing two of its pages. The amended affidavit filed during trial included those pages.

[5]It is unclear who fathered Jaden. Mother's original and amended answers stated that the father was unknown. The trial court terminated the parental rights of

3

room at Children's Medical Center Dallas. Lab testing done during that visit revealed that Jaden's seizure was caused by his low calcium levels. At that time, Mother reported that she was giving Jaden almond and oat milk.[6] The endocrinology team at the hospital wanted to admit Jaden so that he could be given calcium directly into his veins through an IV. According to Michael Yu, a doctor who worked with Children's Medical Center Dallas as a child abuse and neglect fellow, the recommended IV treatment was necessary because Jaden risked "seizures, permanent brain damage[,] and even death" if his underlying low-calcium issue was not resolved. Mother asked hospital personnel whether Jaden could receive outpatient treatment with calcium supplementation, and she was told that Jaden's condition was "so severe at that time that it would take weeks to normalize his calcium levels and until then he was still at risk for seizures." Despite that concern, Mother took Jaden out of the hospital.

The Department opened up a case regarding Jaden in March 2023 because Mother had left the hospital with him against medical advice. The Department wanted Mother and Jaden to follow-up with the endocrinologist who had wanted to admit Jaden to the hospital, but Mother was reluctant, telling the Department's

Jaden's alleged father, D.W. (Alleged Father), in the same order in which it terminated Mother's parental rights. Alleged Father does not appeal. At trial, a Department permanency supervisor testified that the Department "believe[d] it is possible" that Jaden's maternal grandfather, J.S., is Jaden's father.

[6]At the termination trial, a doctor testified that a twenty-two-month-old child should be eating solid foods and stated that it is recommended that children be introduced to soft foods around six months of age.

4

investigator that she wanted "to take a holistic approach versus traditional medication." Despite Mother's reluctance, she later took him to see the endocrinologist, in addition to taking him to see a feeding therapist. Because it appeared that Mother was getting Jaden the care that he needed, the Department closed its case in March 2023. Shortly after the Department closed its case, Mother stopped taking Jaden to the endocrinologist.

## B. Jaden's Declining Health and the Department's December 2023 Contact with Mother

On December 7, 2023, the Department received a referral notifying it of concerns that Jaden was losing his hair, had a rash on his body, and was losing weight. That same day, Kassandra Rodriguez, a Department investigator, met with Mother and Jaden to discuss the Department's concerns. Mother told Rodriguez that Jaden had "had an allergic reaction to detergent when she had washed his clothing and his car seat liner." Rodriguez observed what she believed to be a chemical burn on Jaden's skin, noting that his entire skin across his body (with the exception of his face) was red and "splotchy."[7] Mother told Rodriguez that the rash had begun in late September or early October and that she had taken Jaden to the doctor on October 4. Rodriguez was concerned that Mother had not returned Jaden to the doctor to treat the rash, despite its ongoing presence, and Rodriguez advised Mother to make a

---

[7]Mother did not allow Rodriguez to take photographs of Jaden's condition. According to Rodriguez, Mother stated that she was "Instagram famous" and that she did not make internet posts about Jaden and did not want him to be photographed.

follow-up appointment with the doctor. When asked by Rodriguez about Jaden's weight, Mother denied that Jaden had lost weight, stating that he just had a poor appetite and that a therapist was coming to the home to try to increase his appetite.

Rodriguez, who was working for the Department in Dallas County, transferred the case to Tyrone Buskey, an investigator working for the Department in Denton County, the county in which Mother and Jaden resided. Buskey met with Mother at her residence on December 8, 2023. When he met with Mother, Jaden was "covered up," wearing "pajamas, long pants, long shirt, [and a] jacket." Mother did not allow Jaden to disrobe to show Buskey whether the rash had improved, nor did she allow Buskey to take photographs of Jaden because, according to Mother, she was "Instagram famous."

## C. Jaden's December 2023 Emergency Room Visit, Mother's Leaving the Hospital with Jaden Against Medical Advice, and the Department's Removal of Jaden from Mother's Care

On December 20, 2023, Mother took Jaden to the emergency room at Children's Medical Center Dallas upon the advice of Jaden's primary care physician, who was concerned about Jaden's rash and possible kidney failure. The emergency room doctors reported that Jaden's symptoms included "his hair falling out, swelling of his hands, feet, and genitals, and . . . his protein levels were low, [and] some electrolytes were also low." The doctors determined that Jaden had a condition known as kwashiorkors—a condition caused when an individual is not eating enough protein. Yu—the child abuse and neglect fellow who testified at the termination

6

trial—stated that kwashiorkors is not common among children, noting that it is a condition usually seen "in poor resource countries such as sub-Saharan Africa." Yu stated that Jaden's skin was essentially "falling off" because there was not enough protein in his body to build skin cells. Yu also noted that Jaden had "flaky paint dermatosis," which he described as a "skin lesion." Yu testified that the swelling seen in Jaden's hands, feet, and genitals indicated that Jaden's protein deficiency had been occurring for months.

Hospital personnel were also concerned about Jaden's weight. During a wellness visit in October 2022, Jaden had weighed thirty-three pounds and two ounces. But when he arrived at the hospital in December 2023, he weighed only twenty-six pounds. Yu stated that Jaden had been in the "80th percentile for his weight in the first half of 2023" but that "in December of 2023 he had lost five pounds which put him at the 11th percentile." Yu testified that Jaden's loss in weight was particularly concerning given his young age, when children Jaden's age are in "one of the most rapid points of development in their life" and they "need calories and energy to grow and develop their brain." Due to Jaden's malnourishment, hospital personnel were also concerned that Jaden would develop refeeding syndrome. Yu explained that refeeding syndrome occurs when a person is already at low levels of electrolytes and the body uses those low-level electrolytes to digest food that is given, which causes an even further decrease in electrolytes. Yu stated that refeeding syndrome can lead to a person's "sudden death."

Doctors wanted to admit Jaden to the hospital and treat him with antibiotics administered by IV. Mother disagreed with the antibiotic recommended by hospital staff, and she recommended a different antibiotic. According to Yu, Mother was concerned about the side effects of the antibiotic recommended by the hospital. Yu testified, however, that the side effects of the antibiotic recommended by the hospital affected only around 0.02 percent of the population, while the side effects of the antibiotic recommended by Mother affected around eight percent of the population. Yu also stated that the antibiotic recommended by the hospital covered more bacteria than the antibiotic recommended by Mother. Yu testified that it was important that Jaden receive an antibiotic that covered a broad range of bacteria because Jaden's "skin was basically open to the environment."

Multiple doctors spoke to Mother and informed her that it was not safe for Jaden to be discharged from the hospital. In an "Against Medical Advice Note" written by Kathleen Costello, one of the doctors treating Jaden at the hospital, Costello expressly stated, "Given degree of failure to thrive and extent of skin lesions it is unsafe for [Jaden] to continue with [outpatient] plan and risks disability, morbidity[,] and mortality." Despite the concerns raised by Jaden's doctors and despite hospital staff offering to give Jaden a different antibiotic, Mother took Jaden out of the hospital.

Shortly after Mother removed Jaden from the hospital,[8] Yu contacted the Department to relay his concern that Jaden was at a "high risk of death" and needed to be hospitalized. The referral to the Department stated that Jaden was "malnourished," had "swelling of his entire body," had "an infection in his entire body," and had "bleeding to the feet, hands, [and] genital areas of his body." Due to those concerns, the Department removed Jaden from Mother's care on December 21, 2023. Anuki Wachsman, the Department investigator who conducted the removal, immediately took Jaden back to the hospital following removal.

## D. Jaden's Sixty-Five-Day Stay in the Hospital and Later Placement with Great Aunt

Jaden stayed in the hospital for the next sixty-five days. To get the nutrients he needed, a NG tube was placed through his nose and connected to his stomach. Hospital staff later recommended that Jaden get a G-button—a feeding tube that is directly placed in a patient's stomach. During his stay, Jaden was constantly being monitored for refeeding syndrome.

When the Department removed Jaden from Mother's care, Mother was given a caregiver resource form to start the process of finding a potential family placement for Jaden. Mother, however, refused to fill out the form. Because Mother did not initially provide the Department with any names of family members, Jaden was in the hospital for several weeks before another relative—other than Mother—visited him in

[8]Mother and Jaden left the hospital around 11:59 p.m. on December 20, 2023.

the hospital.[9]  Jaden's maternal grandmother, J.H. (Grandmother), and his great aunt, S.H. (Great Aunt),[10] visited Jaden approximately three weeks after his hospitalization. From that point through the rest of his stay in the hospital, Grandmother and Great Aunt were consistently at Jaden's side.[11]

Great Aunt is a registered nurse who works from home.  She became Jaden's kinship placement.  Jaden began living with Great Aunt following his hospital stay. Great Aunt ensured that Jaden had private nursing care at the home, that his NG tube that he continued to use following his release from the hospital was regularly changed, and that he attended therapy appointments.  At the termination trial, Great Aunt testified that Jaden was thriving in her care and that she desired to adopt him.

### E.  The Department's Petition and the Trial Court's Initial Order

On December 22, 2023, the Department filed its petition seeking the termination of Mother's parental rights to Jaden based on, among other grounds, the predicate termination grounds set forth in Subsections (D), (E), and (O) of Section

---

[9]Mother was allowed limited supervised visits with Jaden.

[10]Great Aunt explained her relation to Jaden as follows:  "I was married to [Jaden's] great uncle.  And so my ex-husband is [Mother's] uncle.  And so my kids are [Mother's] first cousins.  And we're now divorced."

[11]Cynthia Grayson, a Department investigation supervisor, stated that Grandmother and Great Aunt were at the hospital "around the clock" after they learned of Jaden's hospitalization.

161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

The same day that the Department filed its original petition, the trial court signed its "Order for Protection of a Child in an Emergency and Notice of Hearing." Through that order, the trial court ordered that the Department take immediate possession of Jaden and named the Department as Jaden's temporary sole managing conservator. Notably, the trial court's order included the following "Notice to Parents" regarding their right to counsel:

> You have the right under [Section] 262.102(d), Texas Family Code, to be represented by an attorney. If you are indigent and unable to afford an attorney, you have the right to request the appointment of an attorney by contacting the court at 362nd Judicial District Court of Denton County, Texas, [phone number given]. If you appear in opposition to the suit, claim indigence, and request the appointment of an attorney, the court will require you to sign an affidavit of indigence[,] and the court may hear evidence to determine if you are indigent. If the court determines you are indigent and eligible for appointment of an attorney, the court will appoint an attorney to represent you.[12]

## F. Mother's First and Second Attorneys and Their Respective Withdrawals

On January 10, 2024, attorney T. Christopher Lewis filed a notice of appearance indicating that he had been retained as Mother's counsel. That same day, Lewis filed an answer, special exceptions, and a counter-petition on Mother's behalf. Just eight days after he had filed his notice of appearance, Lewis filed an agreed

---

[12]The "Notice to Parents" was in bold font and capital letters in the body of the trial court's order.

11

motion to withdraw as Mother's counsel. In that agreed motion, Lewis stated that he and Mother had "a conflict too great to be overcome." Mother signed Lewis's motion, indicating her agreement to it. On January 22, 2024, the trial court signed an order granting Lewis's agreed motion to withdraw.

On February 2, 2024, attorney Demetria C. Howard filed a notice of appearance indicating that she had been retained as Mother's counsel. Eighteen days later, Howard filed a motion to withdraw, stating that she was "unable to effectively communicate with [Mother] in a manner consistent with good attorney-client relations." That same day, Mother signed a statement indicating that she had received and reviewed the motion and that she consented to Howard's discharge as her attorney of record. On February 22, 2024, the trial court signed an order granting Howard's motion to withdraw. The trial court's order noted that an adversary hearing was set for 9:00 a.m. on February 28, 2024.

## G. Mother's Third, Fourth, and Fifth Attorneys, and Their Respective Withdrawals

At 3:57 a.m. on February 28, 2024—the day of a scheduled adversary hearing[13]—attorney Brenda G. DeRouen filed a notice of appearance indicating that she had been hired as Mother's lead counsel. That same notice of appearance stated that attorneys Gianni Avalos and Cherika Edwards had been hired by Mother as co-

---

[13]That adversary hearing had started on January 11, 2024, and had been continued to February 28, 2024.

12

counsel. Also at 3:57 a.m., DeRouen filed a motion for continuance on Mother's behalf, requesting that the trial court continue the adversary hearing so that counsel could "ensure evidence and testimony is fully ready for a hearing."[14]

On March 22, 2024, Avalos filed a motion to withdraw as Mother's counsel. Avalos stated that good cause existed for her withdrawal because Mother desired her withdrawal. Mother signed Avalos's motion, indicating her agreement and consent to the relief requested in the motion. The same day that the motion to withdraw was filed, the trial court signed an order granting the motion.

On April 4, 2024, the trial court held a status hearing. DeRouen represented Mother during that hearing. In the trial court's order following that hearing, the trial court set the initial permanency hearing for June 13, 2024, set the subsequent permanency hearing for October 10, 2024, and set the termination trial for December 9, 2024.

On May 15, 2024, DeRouen filed a motion to withdraw as Mother's counsel. In her motion, DeRouen stated that good cause existed for her withdrawal because Mother desired her withdrawal. Mother, however, did not sign DeRouen's motion.[15]

---

[14]The clerk's record does not contain any ruling on that motion for continuance. The adversary hearing took place as scheduled on February 28, 2024, and DeRouen and Avalos, who represented Mother at the hearing, did not mention the motion for continuance.

[15]Around this time, the trial court signed temporary orders. In the May 23, 2024 temporary orders, the trial court noted that it had admonished Mother regarding her right to be represented by an attorney and her right to request the appointment of

13

On June 4, 2024, DeRouen filed an amended motion to withdraw as Mother's counsel. That motion was joined by Edwards. DeRouen and Edwards stated that good cause existed for their withdrawal because Mother agreed to their withdrawal. Mother signed the amended motion indicating her agreement to it. On June 5, 2024, the trial court signed an order granting DeRouen and Edwards's amended motion to withdraw.

## H. The Events Before the June 2024 Initial Permanency Hearing, Mother's Sixth Attorney, and the June 2024 Initial Permanency Hearing

On June 10, 2024—three days before the scheduled initial permanency hearing—the Xi-Amaru Republic, a purported indigenous tribe, filed a motion to change jurisdiction, alleging that Jaden was an indigenous child. On June 12, 2024, Mother filed a pro se motion for continuance, requesting that the June 13 initial permanency hearing be continued because of, among other things, the Xi-Amaru Republic's motion to change jurisdiction. Mother attached to her motion a "Tribal Member" card purporting to indicate her membership in the Xi-Amaru Republic.[16]

---

an attorney if she was indigent. Mother, however, never filed an affidavit of indigency in the trial court; instead, she retained many attorneys over the course of the case to represent her.

[16]Throughout the case, Mother also made arguments indicative of the "sovereign citizen" movement. *See Jemerson v. State*, No. 02-23-00036-CR, 2023 WL 6889947, at *5 n.6 (Tex. App.—Fort Worth Oct. 19, 2023, pet. ref'd) (mem. op., not designated for publication) (explaining "sovereign citizen" movement and stating that "so-called 'sovereign citizens'" have "plagued courtrooms across the country"); *Lewis v. State*, 532 S.W.3d 423, 430–31 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (explaining that "so-called 'sovereign citizens' share a common vernacular and

14

The initial permanency hearing ultimately took place on June 20, 2024.[17] At the hearing, attorney Delia Parker-Mims appeared on Mother's behalf. Parker-Mims specifically requested that the record reflect that she was assisting Mother through the initial permanency hearing but that she was not the attorney of record. Parker-Mims also asked for a continuance of the hearing so that Mother could look over medical records pertaining to Jaden's feeding tube. The trial court denied that request, noting that the initial permanency hearing had already been reset and that the issue regarding Jaden's feeding tube had been known since February 2024. In its order following the initial permanency hearing, the trial court gave notice that the final permanency hearing was set on October 10, 2024, and that the termination trial was set for December 9, 2024.

---

courtroom strategy," including "not consenting to trial, arguing over the proper format and meaning of their names, raising nonsensical challenges to subject matter jurisdiction, making irrelevant references to the Uniform Commercial Code, and referring to themselves as trustees or security interest holders"); *see also Royal v. State*, 703 S.W.3d 895, 914 (Tex. App.—Eastland 2024, pet. ref'd) ("Sovereign-citizen rhetoric portrays an awareness of the law, one's constitutional rights, and a broad understanding of the criminal justice system, while in concert with conscious disobedience."). For example, Mother repeatedly referenced "UCC 1-308" when signing documents in the case, stating that she signed the documents with "[a]ll rights reserved without prejudice." She also started her opening statement by saying, "My name is [actual name given]. Status proper forming noun." When she was called as a witness and asked to state her name, she gave it, then said, "In proper form and style."

[17]It is unclear from the record why the hearing was reset from June 13 to June 20. The record does not contain an order granting Mother's motion to continue the hearing.

## I. The September 2024 Hearing and Mother's Seventh Attorney

The trial court conducted a hearing on September 12, 2024, regarding various motions filed by the parties. Mother appeared pro se at that hearing. At the beginning of the hearing, the trial court asked Mother whether she had counsel. Mother stated that Bryan Fagan was her counsel and that Fagan was unable to attend the hearing. The trial court then noted that it did not see anything in its file indicating that Fagan represented Mother, and Mother stated that Fagan should have filed something indicating his representation either that morning or the previous day. Mother asked for a continuance of the hearing, stating that she did not have counsel present. The trial court denied that request, noting that the hearing had been scheduled for several weeks and that no attorney had filed an appearance on Mother's behalf. At the hearing, the trial court found that there was no evidence that Jaden was a child of Indian heritage.[18] The Department also indicated that it was going to proceed with the December 9, 2024 termination trial. Following the hearing, the trial court signed an order stating that the Xi-Amaru Republic was not a federally recognized tribe and was not entitled to intervene in this case.[19]

---

[18]At the hearing, the attorney ad litem told the trial court that the Xi-Amaru Republic had sent a cease-and-desist letter to a doctor that was going to perform Jaden's G-button surgery and that the doctor ended up canceling that surgery. Jaden never had the G-button surgery.

[19]The Xi-Amaru Republic appealed that ruling to our court. *See In re J.S.*, No. 02-24-00436-CV, 2024 WL 4509773, at *1 (Tex. App.—Fort Worth Oct. 17,

16

**J. The October 2024 Final Permanency Hearing**

On October 9, 2024—the day before the final permanency hearing—Mother, proceeding pro se, filed a motion for continuance, asking for a twenty-one-day extension of the hearing. As to the grounds for the continuance, Mother said that she needed additional time to retain a lawyer, stating, "The respondent was unable to retain counsel due to previous counsel's failure to file as a representative with the court on September 12, 2024, Status Hearing. The firm will not process the refund until the end of the month following 30 days from the cancellation of retainer agreement on September 12, 2024."

Mother appeared pro se at the October 10, 2024 final permanency hearing. During the hearing, Mother urged her motion for continuance. The trial court denied that motion, pointing out that Fagan had not filed anything with the court indicating that he represented Mother at the September 12, 2024 hearing. The trial court further told Mother that if she did obtain representation, the court would go forward with any hearings requested by her counsel. The final permanency hearing proceeded. During the hearing, Mother expressed confusion regarding the process for selecting providers under her service plan. The trial court responded to Mother's confusion by stating, "Well, I can't give you legal advice. That's the reason I've been wanting you to hire an attorney. So – but I can't give you legal advice and tell you what to do."

2024, no pet.) (per curiam) (mem. op.). We dismissed the appeal for lack of jurisdiction. *See id.*

17

Following the hearing, the trial court signed its "Permanency Hearing Order Before Final Order." In that order, the trial court specifically found that the parents who attended the hearing—which would include Mother—had been given certain admonishments, including an admonishment of the right to be represented by an attorney and the right to request the appointment of an attorney if the parent is indigent and unable to afford an attorney.

## K. The December 2024 Termination Trial, the Appearance of Mother's Eighth Attorney During the Termination Trial, and the Withdrawal of Mother's Eighth Attorney

The termination trial began on December 9, 2024. At the beginning of the trial, Mother asked for a continuance, pointing to a constitutional challenge that she had filed before trial that challenged the constitutionality of a state statute.[20] The trial court denied Mother's request to continue the trial, noting that Mother had nearly six months' notice of the trial date yet waited "five days before trial" to file her challenge to the constitutionality of a statute.

At 11:44 a.m. on the first day of trial, attorney Kim Cole filed a notice of appearance as Mother's counsel of record. Cole appeared in person at trial in the

---

[20]Mother's original motion challenging the constitutionality of a statute was filed on November 21, 2024. That motion challenged the "validity of statute 262.001." On December 4, 2024, Mother filed an amended motion, giving greater specificity to the statutes she was challenging. Mother makes no argument on appeal regarding the constitutionality of any statute.

midst of voir dire.[21] Outside of the jury's presence, Cole orally requested a continuance so that she could "familiarize [her]self with the facts of the case." The trial court denied that request, stating,

> With regard to that, this case has been set for trial since June. [Mother's] had many opportunities to hire an attorney, on several occasions said she did, turns out she didn't. I've offered to let her get a court-appointed attorney. She's refused that.
>
> So we started this morning on jury selection, so the motion for continuance at this point is denied.
>
> So you're welcome to question the venire panel when they come in or however you want to do that.
>
> So you're free to represent her, but at this point in time we're going forward on the jury trial.

Following that ruling, Cole briefly engaged in voir dire.[22] She then asked for and was granted a recess to confer with Mother. After the recess, Cole requested that she be allowed to withdraw as counsel because she was "not adequately prepared to proceed, and ethically [she] cannot proceed in this matter." That request was made in Mother's presence, and Mother voiced no objection to it. The trial court granted

---

[21]Voir dire began on page twenty-two of the sixth volume of the reporter's record. Cole's appearance at the trial is reflected on page ninety-two of that volume.

[22]Cole's questions to the jury panel began on page ninety-three of the sixth volume of the reporter's record and ended on page ninety-five. During that exchange, Cole described the case as "a custody case."

19

Cole's request to withdraw.[23] Mother then represented herself throughout the duration of the trial.[24]

At various points in the trial, the trial court warned Mother not to communicate with outsiders or persons in the gallery during the trial, mentioning that Mother had had numerous opportunities to obtain counsel. To that end, the trial court told Mother,

> All right. Well, at this point in time you need to make sure that you're only – that you don't have any communication with anybody during the trial. You can do it on breaks and things like that, but during the case you need to be doing it on your own since that's what you chose instead of getting an appointed attorney. So make sure that you're not communicating with anyone.
>
> . . . .
>
> [J]ust make sure that you're not chatting with somebody, because this is causing the trial to move slowly. And you have an opportunity or had an opportunity to hire an attorney, you did hire several attorneys. So you don't need to be communicating with anyone else regarding the case at this point in time except during the breaks.
>
> So don't be doing live chats or any communicating while you're questioning witnesses.

---

[23]Cole's motion to withdraw was granted on page ninety-six of the sixth volume of the reporter's record. Thus, Cole's appearance at the termination trial was limited to five pages of the reporter's record.

[24]During the trial, Mother made numerous objections (many of which were successful), cross-examined witnesses, and was allowed several breaks by the trial court to review documents.

Numerous witnesses, including Mother, testified at the termination trial.[25] Before Mother was called as a witness, the trial court admonished her on her Fifth Amendment right, noting that she was under indictment for endangering Jaden. The trial court later appointed attorney Ervette Sims to represent Mother in the criminal matter. Mother asked for a continuance so that she could seek her own attorney to represent her in the criminal matter, but the trial court denied the request, stating that Mother had had ample time to find a criminal-defense attorney.

Sims appeared on the last day of the termination trial and sat next to Mother during her testimony. Both Sims and the trial court admonished Mother regarding her Fifth Amendment right not to testify. Mother later invoked her Fifth Amendment right not to answer questions on numerous occasions, including to questions regarding Jaden's hospitalizations, skin condition, weight, and health. After the jury began deliberations, Mother was arrested and taken into custody.

## L. The Jury's Verdict and the Trial Court's Termination Order

At the conclusion of trial, the jury returned a unanimous verdict finding that Mother had engaged in conduct under Subsections (D), (E), and (O) of Section 161.001(b)(1) of the Family Code and that termination of her parental rights was in Jaden's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O),

---

[25]Much of the pertinent testimony has already been discussed in our factual recitation of Jaden's various hospitalizations and the Department's contact with Mother. Because Mother does not raise any sufficiency complaints on appeal, we need not detail the testimony further. *See* Tex. R. App. P. 47.1.

21

(2). The trial court later signed a termination order in accordance with the jury's findings. The trial court admonished Mother regarding her right to appeal the termination order and told her that it could appoint an attorney to represent her on appeal if she requested one. Mother appeals from the trial court's termination order. Mother has retained counsel for her appeal.

## III. DISCUSSION

### A. Mother's Complaint Regarding the Trial Court's Alleged Failure to Elicit or Obtain Her Voluntary and Written Waiver of Counsel

In her first issue, Mother argues that the trial court's failure to elicit or obtain her voluntary and written waiver of counsel caused reversible error.[26]

---

[26]In its brief, the Department argues that Mother "[a]rguably" did not preserve this issue. In support of that argument, the Department points to *In re S.G.*, No. 02-14-00245-CV, 2015 WL 392772 (Tex. App.—Fort Worth Jan. 29, 2015, no pet.) (per curiam) (mem. op.). In that case, a father represented himself at a termination trial, and his parental rights to his child were terminated. *Id.* at *1–2. On appeal, the father complained that "the trial court erred by not warning him about the dangers and disadvantages of self-representation and by not ensuring that his waiver of trial counsel was knowing and intelligent." *Id.* at *4. Pointing to Texas Rule of Appellate Procedure 33.1(a), we held that the father had not preserved this complaint because he had not raised it in the trial court. *Id.* at *4, *4 n.12 (citing Tex. R. App. P. 33.1(a)). While we are cognizant of our holding in *S.G.*, we are also cognizant of authority stating, at least in the criminal context, that the right to counsel is a waivable-only right that may be raised for the first time on appeal. *See, e.g.*, *State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009) (holding that Rule 33.1 "does not apply to rights which are waivable only or to absolute systemic requirements, the violation of which may still be raised for the first time on appeal"); *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002) ("Examples of rights that are waivable-only include the rights to the assistance of counsel and the right to trial by jury."); *Rimes v. State*, No. 05-21-00038-CR, 2022 WL 3593282, at *5 (Tex. App.—Dallas Aug. 23, 2022, no pet.) (mem. op., not designated for publication) ("The right to assistance of counsel, however, is a waivable-only right."). In the context of criminal cases, a defendant will

## 1. Applicable Law

Several different areas of law intersect in our analysis of Mother's first issue—namely, the Texas Family Code's provisions regarding the right to counsel in a termination case, *Faretta*'s[27] requirements and whether *Faretta* warnings are required in a termination case, and case law holding that a party may not use the right to counsel to manipulate the court system.

### a. The Family Code's Provisions Regarding the Right to Counsel in a Termination Case

We begin with the Family Code's provisions regarding the right to counsel in a termination case.

Family Code Section 107.013(a)(1) provides that in a suit filed by a governmental entity in which termination of the parent–child relationship is requested, the trial court shall appoint an attorney ad litem to represent the interests of an indigent parent who responds in opposition to the termination. Tex. Fam. Code Ann. § 107.013(a)(1). A parent's filing of an affidavit of indigency triggers the process for mandatory appointment of an attorney ad litem. *In re V.L.B.*, 445 S.W.3d 802, 805 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (op. on reh'g); *In re K.L.L.H.*,

---

not be deemed to have lost a waivable right unless the defendant does so plainly, freely, and intelligently, sometimes in writing and always on the record. *Hughes v. State*, 691 S.W.3d 504, 515 (Tex. Crim. App. 2024). We will assume, without deciding, that Mother has preserved this complaint.

[27] *See Faretta v. California*, 422 U.S. 806, 807, 818–20, 95 S. Ct. 2525, 2527, 2532–33 (1975).

No. 06-09-00067-CV, 2010 WL 87043, at *5 (Tex. App.—Texarkana Jan. 12, 2010, pet. denied) (mem. op.); *see In re B.C.*, 592 S.W.3d 133, 134 (Tex. 2019) ("When a parent claims indigence, an attorney shall be appointed if the trial court determines the parent is indigent, but the court may not hold a hearing to make that determination until the parent has filed an affidavit of indigence in accordance with the rules of civil procedure.").

Section 107.013(a-1) provides that, in a suit filed by a governmental entity in which termination of the parent–child relationship is requested, if a parent is not represented by an attorney at the parent's first appearance in court, the trial court shall inform the parent of the right to be represented by an attorney. Tex. Fam. Code Ann. § 107.013(a-1)(1). That Section further provides that if the parent is indigent and appears in opposition to the suit, the trial court shall inform the parent of the right to an attorney ad litem appointed by the court. *Id.* § 107.013(a-1)(2). Section 263.0061 provides further protections for parents not represented by counsel at other points of a termination proceeding. *See id.* § 263.0061. That Section states, in pertinent part,

> At the status hearing . . . and at each permanency hearing . . . held after the date the court renders a temporary order appointing the department as temporary managing conservator of a child, the court shall inform each parent not represented by an attorney of: (1) the right to be represented by an attorney; and (2) if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney.

*Id.* § 263.0061(a).

24

### b. *Faretta*'s Requirements and Whether *Faretta* Warnings are Required in a Termination Case

"The United States Supreme Court places termination of parental rights cases in the same category as criminal cases and analogizes a parent losing parental rights to 'a defendant resisting criminal conviction' because both seek 'to be spared from the State's devastatingly adverse action.'" *In re C.L.S.*, 403 S.W.3d 15, 20 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 125, 117 S. Ct. 555, 568 (1996)).

A criminal defendant has the right to the assistance of counsel, as well as the right to waive counsel and represent herself. *See* U.S. Const. Amend. VI; Tex. Code Crim. Proc. Ann. art. 1.05; *Faretta*, 422 U.S. at 807, 818–20, 95 S. Ct. at 2527, 2532–33. Under *Faretta*, a criminal defendant should be warned of the dangers and disadvantages accompanying the waiver of the right to counsel and the decision to self-represent. *Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541. The admonishments required by *Faretta* for self-representation "depend on the circumstances," including depending on the "stage of the proceedings and the assistance counsel can provide at that stage." *Huggins v. State*, 674 S.W.3d 538, 541 (Tex. Crim. App. 2023). "There is no formula or script that must be read to a defendant who asserts h[er] right to self-representation," but the trial court "must take an active role in assessing whether the defendant knowingly exercises that right." *Id.* The assertion of the right to self-representation is what triggers the *Faretta* warnings. *See Faretta*, 422 U.S. at 835, 95 S.

Ct. at 2541; *Richmond v. State*, 04-95-00326-CR, 1996 WL 452959, at \*3 (Tex. App.—San Antonio Aug. 7, 1996, no pet.) (not designated for publication) ("[A] clear and unequivocal request for self-representation . . . triggers the admonishment requirements in *Faretta*."); *see also Theorine v. State*, No. 12-22-00058-CR, 2023 WL 5764283, at \*1 (Tex. App.—Tyler Sept. 6, 2023, pet. ref'd) (mem. op., not designated for publication) ("[T]he defendant's right to self-representation is not triggered until it is asserted.").

Our intermediate appellate courts are split on the issue of whether *Faretta* warnings are required in a termination case, and we have yet to weigh in on the issue. On the one hand are cases that suggest that *Faretta* warnings are not required in a termination case. *See A.G. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-22-00502-CV, 2022 WL 17982121, at \*5 (Tex. App.—Austin Dec. 29, 2022, no pet.) (mem. op.) (stating that while the "better practice" is for a trial court to give *Faretta*-like warnings to parents wishing to proceed pro se in termination cases, "that is not what the Texas Family Code currently requires," and concluding that the trial court had complied with all statutory requirements under the Family Code); *In re E.A.F.*, 424 S.W.3d 742, 746–49 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (declining invitation to apply *Faretta* to termination case); *In re A.H.L.*, 214 S.W.3d 45, 52 (Tex. App.—El Paso 2006, pet. denied) (discussing *Faretta*'s ill-fit to termination proceedings and holding that "the Sixth Amendment does not apply in parental rights termination proceedings" and that "a right of self-representation is not a necessary component of

26

a fair parental rights termination proceeding"); *see also In re H.M.P.*, No. 13-18-00387-CV, 2018 WL 5832099, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 8, 2018, pet. denied) (mem. op.) (discussing *Faretta* and *A.H.L.* and stating that it found *A.H.L.*'s reasoning "persuasive").

On the other hand are cases that suggest that *Faretta* warnings are required in a termination case. *See In re L.J.*, No. 09-19-00457-CV, 2020 WL 3057296, at *7 (Tex. App.—Beaumont June 9, 2020, no pet.) (mem. op.) ("If a trial court elects to allow a parent to proceed *pro se*, the trial court must inform the parent of the dangers of self-representation before permitting the parent to proceed *pro se*, and a parent's waiver of the right to counsel must, at the very least, be knowing and intelligent."); *In re K.E.R.*, No. 04-19-00808-CV, 2020 WL 1866468, at *4 (Tex. App.—San Antonio Apr. 15, 2020, pet. denied) (mem. op.) ("[A]n indigent parent may waive the right to counsel in a termination proceeding if the trial court first admonishes him regarding the risks of self-representation or if the parent has standby counsel or hybrid representation."); *In re J.G.*, 587 S.W.3d 25, 30 (Tex. App.—Tyler 2018, no pet.) (per curiam) ("In a termination case, before a parent is permitted to represent herself, the record should show that the trial court informed her that there are technical rules of evidence and procedure, and she will not be granted special consideration solely because she asserted her right of self-representation."); *In re R.H.*, No. 01-14-00874-CV, 2015 WL 4594557, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2015, no pet.) (mem. op.) (noting that the Family Code "does not expressly provide an indigent parent with a

right of self-representation" but stating that "if a trial court elects to permit a parent in a parental termination proceeding to proceed pro se, the trial court must inform the parent of the dangers of self-representation before permitting the parent to proceed pro se"); *C.L.S.*, 403 S.W.3d at 21–22 (holding that *Faretta* warnings are required in termination cases); *see also In re M.H.*, 668 S.W.3d 426, 430–31 (Tex. App.—Amarillo 2023, no pet.) (stating that "[a] parent's waiver of the right to counsel must, at the very least, be knowing and intelligent" and holding that there was no evidence presented in the trial court that the mother knowingly and intelligently waived her right to her court-appointed attorney).

### c. Case Law Holding That a Party May Not Use the Right to Counsel to Manipulate the Court System

In the analogous criminal context, the right to an attorney is not absolute and must be balanced with "other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex. Crim. App. 2003); *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 152, 126 S. Ct. 2557, 2565–66 (2006) (noting that trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against demands of its calendar"). "Trial courts have the duty, and discretion, to maintain the orderly flow and administration of judicial proceedings, including the exercise of a defendant's right to counsel." *Medley v. State*, 47 S.W.3d 17, 23 (Tex. App.—Amarillo 2000, pet. ref'd) (op. on reh'g).

"A defendant may not use his right to counsel to manipulate the court or to delay his trial." *Culverhouse v. State*, 755 S.W.2d 856, 861 (Tex. Crim. App. 1988). Similarly, a defendant "does not have the right to repeatedly alternate his position on the right to counsel and thereby delay trial." *Medley*, 47 S.W.3d at 23. "Thus, an accused may not wait until the day of trial to demand different counsel or to request that counsel be dismissed so that he may retain other counsel." *Webb v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976). Indeed, "[a] trial court's refusal to appoint counsel at the eleventh hour does not render the defendant's invocation of the right to self-representation involuntary." *Davis v. State*, No. 09-15-00450-CR, 2017 WL 1953277, at *3 (Tex. App.—Beaumont May 10, 2017, no pet.) (mem. op., not designated for publication) (citing *Tutt v. State*, 339 S.W.3d 166, 173 (Tex. App.—Texarkana 2011, pet. ref'd)).

### 2. Analysis

We begin our analysis by noting that the trial court repeatedly admonished Mother regarding her right to counsel and her right to request the appointment of counsel if she was indigent. Mother, however, did not file an affidavit of indigency in the trial court. Indeed, Mother retained numerous attorneys during the pendency of the case, and she had two separate GoFundMe pages that had raised $28,348 toward legal expenses.[28] Despite the fact that Mother never filed an affidavit of indigency and

---

[28]One of the pages seeking funding stated, in pertinent part, "Your donations will help cover legal fees and other expenses necessary to bring [Jaden] home to his

seemingly had the funds to retain counsel, the trial court offered to appoint counsel to represent Mother. Mother refused that offer. Thus, based on this record, we hold that the trial court met its obligations under the Family Code to admonish mother of her right to counsel.[29] *See* Tex. Fam. Code Ann. §§ 107.013(a-1), 263.0061.

And we need not weigh in on the split amongst the intermediate appellate courts regarding whether *Faretta* warnings are required in termination cases. This is because we will hold that, based on this record: (1) Mother never invoked her right to proceed pro se—the action that would arguable have triggered a *Faretta* warning; (2) her failure to have representation at trial was because she tried to manipulate the court system; and (3) by doing so, Mother has knowingly and voluntarily waived her right to counsel. Two cases are instructive on these points.

In *In re H.L.W.*, the trial court appointed a father three separate attorneys to represent him in a termination case brought by the Department. No. 01-21-00654-CV, 2022 WL 16756688, at *6 (Tex. App.—Houston [1st Dist.] Nov. 8, 2022, no pet.) (mem. op.). Two of those previously appointed attorneys filed motions to withdraw—which were unopposed by the father—citing an inability to effectively

---

mother." The other page stated, in pertinent part, "Your donations will go towards covering legal fees for a competent attorney who will advocate for our rights, ensuring that we receive a fair chance to be reunited. Additionally, funds will be allocated to cover therapy sessions to help us heal from the trauma of separation."

[29]Mother makes no argument to the contrary in her brief; indeed, Mother does not cite the Family Code in her discussion of her first issue.

communicate with him. *Id.* Trial started with the third appointed attorney, but it was ultimately continued. *Id.* at \*5. The day before the trial was to continue, the third appointed attorney filed a motion to withdraw—which was opposed by the father—stating that good cause existed for the withdrawal because the father had filed or planned to file a grievance against the attorney with the Texas State Bar. *Id.* at \*6. When the trial resumed, the third appointed attorney presented his motion to withdraw to the trial court. *Id.* The trial court granted the motion, finding that by his actions, the father had waived his right to counsel and was representing himself. *Id.* A lengthy exchange then took place between the trial court and the father. *Id.* at \*6–9. During that exchange, the father objected to his third appointed attorney's withdrawal, stated that he would not be representing himself, and asked for the trial court to appoint him new counsel. *Id.* at \*7–8. The trial court declined to appoint the father a new attorney, the father walked out of the trial, the trial continued in the father's absence, and the trial court ultimately terminated the father's parental rights. *Id.* at \*8–9, \*11.

On appeal, the First District Court of Appeals held that the trial court did not abuse its discretion by permitting the father's attorney to withdraw. *Id.* at \*12–13. It held that "Father's failure to be represented at trial was due to his own actions." *Id.* at \*14. The court looked to "the analogous criminal context," noting that "a defendant may not use his right to counsel to manipulate the court or to delay his trial." *Id.* (citing *Culverhouse*, 755 S.W.2d at 861). And the court held, "So too should [the father]

31

not be permitted to use his right to counsel in termination proceedings to manipulate and delay the trial." *Id.*

In *Davis*, two different attorneys were appointed to represent a defendant before she appeared pro se. 2017 WL 1953277, at *3. At the defendant's trial, the pro se defendant requested a continuance, arguing that she needed to hire an attorney. *Id.* The trial court reminded the defendant that they "ha[d] been through this before" and that the defendant "did not want a court appointed lawyer" and "chose not to hire a lawyer." *Id.* The trial court also noted that the trial date had been set for two weeks and that the State was ready. *Id.* at *4. Ultimately, the trial court denied the motion for a continuance, the trial proceeded, and the defendant was convicted. *Id.* at *2, *4.

On appeal, the court of appeals noted that the defendant had appeared pro se for more than a year and that she "only requested an attorney on the day trial commenced, at the same time she requested a continuance." *Id.* at *4. The court also noted that the record reflected that the defendant "had previously made it known that she did not want appointed counsel." *Id.* The court held that, based on that record, "[t]he trial court could have reasonably concluded that [the defendant's] request for an attorney was made in a manner that 'obstruct[ed] the judicial process or interfere[d] with the administration of justice.'" *Id.* (quoting *Green v. State*, 840 S.W.2d 394, 408 (Tex. Crim. App. 1992)). Thus, the court held that the trial court did not abuse its

discretion by denying the defendant appointed counsel that she requested on the day of trial. *Id.*

Turning to our case, the record reflects that Mother never invoked her right to proceed pro se—the action that would arguably have triggered a *Faretta* warning. *See Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541; *Richmond*, 1996 WL 452959, at *3; *see also Theorine*, 2023 WL 5764283, at *1. The record further reflects that Mother had a pattern of attempting to delay the termination proceedings by hiring counsel at the "eleventh hour" and by engaging in other dilatory tactics in an effort to manipulate the trial court proceedings. To that end, the record reflects the following:

- February 2024 adversary hearing—At 3:57 a.m. on the day of the scheduled adversary hearing, DeRouen, Avalos, and Edwards filed a notice of appearance indicating that they had been hired as Mother's counsel. At that same time, DeRouen filed a motion for continuance on Mother's behalf, asking that the hearing be reset so that counsel could "ensure evidence and testimony is fully ready for a hearing."

- June 2024 initial permanency hearing—Three days before the scheduled initial permanency hearing, the Xi-Amaru Republic filed a motion to change jurisdiction. The day before the hearing, Mother filed a pro se motion to continue the hearing because of, among other things, the Xi-Amaru Republic's motion to change jurisdiction. Parker-Mims appeared at the hearing (this was her first appearance) and told the trial court that she was assisting Mother at the permanency hearing but that she was not the attorney of record. Parker-Mims asked for a continuance of the hearing.

- September 2024 hearing—Mother stated at the hearing that she had hired Fagan as counsel, and when told by the trial court that it had nothing in its file indicating that Fagan represented her, Mother stated that Fagan should have filed something indicating his representation

33

either that morning or the prior day. At the hearing, Mother asked for a continuance of the hearing due to Fagan not being present.

- October 2024 final permanency hearing—The day before the final permanency hearing, Mother filed a motion asking for a twenty-one-day continuance of the hearing. Mother appeared at the hearing the next day, and she asked that the trial court grant her motion for continuance so that she could obtain counsel.

- December 2024 trial—Despite having notice of the trial since June 2024, Mother began the trial pro se. She asked for the trial to be continued based on a motion she had recently filed challenging the constitutionality of a state statute. Cole filed a notice of appearance at 11:44 a.m. on the first day of the termination trial. Cole orally requested a continuance so that she could "familiarize [her]self with the facts of the case."

- The record also reflects that Mother declined the trial court's offer to appoint her counsel.

On this record, we hold that Mother's repeated attempts to hire attorneys at the "eleventh hour" and her repeated attempts to continue legal proceedings ostensibly so that newly-hired counsel could become familiar with the case was an effort to delay and affect the outcome of the termination proceeding, a proceeding with a fast-approaching statutory dismissal deadline. *See* Tex. Fam. Code Ann. § 263.401(a); *H.W.*, 2022 WL 16756688, at *12–14; *Davis*, 2017 WL 1953277, at *4; *see also Mosquera v. State*, No. 09-22-00039-CR, 2023 WL 6134780, at *16 (Tex. App.—Beaumont Sept. 20, 2023, no pet.) (mem. op., not designated for publication) ("As is clear from this record, Mosquera made continuous demands to change attorneys and represent himself in an effort to affect the outcome of proceedings."). Thus, based

on this record, we hold that Mother has knowingly and voluntarily waived her right to counsel.[30]

We overrule Mother's first issue.

## B. Mother's Complaint Regarding the Trial Court's Denial of Her Attorney's Oral Motion for Continuance at Trial

In her second issue, Mother argues that she was prejudiced by the trial court's denial of her attorney's oral motion for continuance at trial.[31]

### 1. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *In re Z.C.*, 280 S.W.3d 470, 478 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam); *see BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

A motion for continuance must be in writing. *Hale v. Hale*, No. 02-23-00234-CV, 2024 WL 4510195, at *4 (Tex. App.—Fort Worth Oct. 17, 2024, pet. denied)

---

[30]Mother put the trial court in a no-win situation. She did not file an affidavit of indigency, she refused the trial court's attempts to appoint her counsel, she never clearly invoked the right to proceed pro se, and she delayed retaining counsel, all while the trial court was hamstrung with the impending statutory dismissal deadline.

[31]In her brief, Mother does not complain about the trial court's denial of any request for continuance other than the one made by her counsel at trial.

(mem. op.); *Serrano v. Ryan's Crossing Apartments*, 241 S.W.3d 560, 564 (Tex. App.—El Paso 2007, pet. denied). A trial court generally does not abuse its discretion when it denies an oral motion for continuance. *Hale*, 2024 WL 4510195, at \*4; *In re J.P.-L*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied). Texas Rule of Civil Procedure 251 provides that no continuance shall be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Thus, a trial court generally does not abuse its discretion by denying a motion for continuance that is unsupported by an affidavit. *Hale*, 2024 WL 4510195, at \*4; *In re G.Z.*, No. 02-21-00122-CV, 2021 WL 3796049, at \*7 (Tex. App.—Fort Worth Aug. 26, 2021, no pet.) (mem. op.).

## 2. Analysis Regarding Denial of Continuance

Here, Mother's attorney, Cole, filed a notice of appearance at 11:44 a.m. on the first day of the termination trial. When Cole arrived in the courtroom, she orally requested a continuance so that she could "familiarize [her]self with the facts of the case." The trial court denied that request, noting that the December trial date had been set since June, that Mother had previously had numerous opportunities to hire an attorney or obtain a court-appointed attorney, and that voir dire had already started. Notably, Cole's request for a continuance was not in writing, was not supported by an affidavit, and was not consented to by the Department. Thus, the

36

trial court did not abuse its discretion by denying it.[32] *See Hale*, 2024 WL 4510195, at *4 (holding that trial court did not abuse its discretion by denying oral motion for continuance that was not supported by an affidavit); *G.Z.*, 2021 WL 3796049, at *7 ("[B]ecause [m]other's motion for continuance was not verified or supported by affidavit, we cannot say that the trial court abused its discretion by denying it."); *J.P.-L*, 592 S.W.3d at 576 (holding that trial court did not abuse its discretion by denying mother's oral request for a continuance because the request did not comply with Rule 251 and the parties did not consent to the request).

### 3. Analysis Regarding Cole's Request to Withdraw

While Mother's second issue is phrased as an attack on the trial court's order denying Cole's oral motion for continuance made at trial, in the argument section pertaining to that issue, Mother also seemingly complains about the trial court's grant of Cole's request to withdraw as her counsel. We thus turn to that complaint.

---

[32]"Moreover, the goal of establishing a stable, permanent home for a child is a compelling government interest that may justify the trial court's denial of a motion for continuance in a parental termination case." *In re J.P.H.*, No. 04-23-00131-CV, 2023 WL 5280376, at *8 (Tex. App.—San Antonio Aug. 16, 2023, pet. denied) (mem. op.). Given Jaden's need for permanence, the trial court could have exercised its discretion by denying a motion for continuance requested by an attorney that had appeared for the first time after trial had begun, particularly given that Mother had hired and shown an inability to work with several other attorneys during the pendency of the case and had refused the trial court's suggestion to obtain court-appointed counsel. *See id.* (holding that trial court did not abuse its discretion by denying father's oral motion for continuance because it did not comply with Rule 251 and a continuance would delay the children's need for permanence); *In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *2 (Tex. App.—San Antonio Aug. 3, 2022, no pet.) (mem. op.) (similar).

37

### a. Mother Has Failed to Preserve Any Complaint Regarding Cole's Withdrawal

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

Here, Mother did not raise any complaint in the trial court regarding Cole's withdrawal as her counsel, despite being present in the courtroom when Cole moved for and the trial court granted Cole's request to withdraw.[33] Thus, Mother has not preserved for our review any complaint regarding Cole's withdrawal. *See* Tex. R. App. P. 33.1(a)(1)(A); *Bushell*, 803 S.W.2d at 712; *Ennadi v. Ennadi*, No. 01-21-00252-CV, 2023 WL 105109, at *3 (Tex. App.—Houston [1st Dist.] Jan. 5, 2023, pet. denied) (mem. op.) (holding that appellant who did not consent to his counsel's withdrawal motion failed to preserve error by not objecting at the hearing on the motion); *Harrison v. Reiner*, 607 S.W.3d 450, 464 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (holding that appellant's various complaints on appeal related to her counsel's withdrawal were waived because she did not raise the complaints in the trial court); *In re A.T.*, No. 05-16-00539-CV, 2017 WL 2351084, at *7 (Tex. App.—Dallas May 31,

---

[33]The record reflects that Cole conferred with Mother right before she asked to withdraw.

38

2017, no pet.) (mem. op.) (holding that father waived complaints that his counsel's withdrawal motion did not comply with Texas Rule of Civil Procedure 10 and that the trial court did not sign a written order granting the motion by not presenting those complaints to the trial court); *E.T. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-15-00274-CV, 2015 WL 5781248, at *2 (Tex. App.—Austin Sept. 29, 2015, no pet.) (mem. op.) (holding that mother and father did not preserve their complaints relating to the withdrawal of their attorney when they did not raise the complaints to the trial court); *Evans v. Linares*, No. 14-14-00468-CV, 2015 WL 1874232, at *3 (Tex. App.—Houston [14th Dist.] Apr. 23, 2015, pet. dism'd w.o.j.) (mem. op.) ("But, there is no indication in the record that Evans challenged whether his attorney had valid grounds to withdraw, or that Evans sought any conditions on withdrawal or other considerations from the trial court.  Therefore, Evans failed to preserve error.").

### b.  The Trial Court Did Not Abuse Its Discretion By Permitting Cole to Withdraw

Even if Mother had preserved her complaint regarding Cole's request to withdraw, we would hold that the trial court did not abuse its discretion by granting the request.

We review the grant or denial of a motion to withdraw for an abuse of discretion.  *Sims v. Sims*, 623 S.W.3d 47, 54 (Tex. App.—El Paso 2021, pet. denied); *see In re B.C.*, No. 02-22-00256-CV, 2022 WL 17172338, at *6 (Tex. App.—Fort Worth Nov. 23, 2022, pet. denied) (mem. op.).  As noted earlier, a trial court abuses its

discretion if it acts without reference to any guiding rules or principles. *Low*, 221 S.W.3d at 614; *Cire*, 134 S.W.3d at 838–39. "[T]he right to counsel may not be used to obstruct the judicial process or to interfere with the efficient, prompt administration of justice." *B.C.*, 2022 WL 17172338, at *6.

In *In re R.R.*, the attorney of a mother in a termination case made an oral motion to withdraw during trial, explaining that the attorney had a conflict of interest. 676 S.W.3d 808, 813 (Tex. App.—Corpus Christi–Edinburg 2023, pet. denied). The trial court granted that motion. *Id.* On appeal, the court of appeals noted that the mother had "hired and fired numerous attorneys during the pendency of the case" and that she had "re-hired one of the previous attorneys to represent her [at trial] even knowing that there was a conflict that could potentially prevent the attorney from representing her at trial at the time she re-hired him." *Id.* at 817. The mother argued on appeal that the trial court should have advised her of her right to counsel after the withdrawal of her attorney. *Id.* The court of appeals disagreed, noting that the mother had been represented by counsel at prior stages of the proceeding and was aware that she was entitled to representation. *Id.* The appellate court stated, "Although counsel did not follow the formal rules governing withdrawal, on the basis of this record as a whole, we cannot conclude that the trial court abused its discretion by permitting him to withdraw." *Id.* The court of appeals also noted that the trial court was uniquely familiar with the history and personalities of the individuals

40

involved in the case, and the trial court was free to consider both in permitting the attorney to withdraw. *Id.*

Here, the record reflects that Mother had hired many attorneys to represent her during this case. But because of Mother's personal conflicts with those attorneys or her desire for them to cease representing her, coupled with her refusal to have the trial court appoint her counsel, Mother began trial representing herself. While Cole made a brief appearance at trial, that was Cole's first appearance in the case, and she herself stated that she needed to "familiarize [her]self with the facts of the case." With the trial having long been set, with the statutory dismissal deadline fast approaching, and with a jury panel assembled and waiting, the trial court understandably denied that "eleventh hour" request. *See* Tex. Fam. Code Ann. § 263.401(a) (establishing statutory dismissal deadline). And, understandably, Cole then sought to withdraw, stating that she was "not adequately prepared to proceed, and ethically [she] cannot proceed in this matter." Mother then finished the trial as she had started it—representing herself.

Based on this record, and cognizant of the fact that the trial court was uniquely familiar with the history and personalities of the individuals involved in the case, we hold that the trial court did not abuse its discretion by allowing Cole to withdraw as Mother's counsel after making such a brief appearance at the termination trial. *See R.R.*, 676 S.W.3d at 817 ("Under these circumstances, we cannot say the trial court abused its discretion in granting counsel's motion to withdraw."); *H.L.W.*, 2022 WL

41

16756688, at *12 ("Under these circumstances, we conclude that the trial court did not abuse its discretion in permitting Father's third appointed counsel to withdraw on the morning of trial.").

We overrule Mother's second issue.

## C. Mother's Complaint Regarding the Department's Filing of An Amended Affidavit in Support of Jaden's Removal

In her third issue, Mother argues that the Department's mid-trial filing of an amended affidavit in support of Jaden's removal constituted fraud, prevented her from properly litigating her case, and caused reversible error.

### 1. The Original Affidavit and the Amended Affidavit

The Department filed its original petition seeking the termination of Mother's parental rights to Jaden on December 22, 2023. The "Affidavit of Anuki Wachsman" was attached to the Department's original petition. In that affidavit, Wachsman explained that she was a Department caseworker, and she set forth certain "facts necessitating [Jaden's] removal." Notably, Wachsman's affidavit appeared to be missing two pages, as it only included pages one, three, five, and six.[34] The same day that the Department filed its original petition, the trial court signed its "Order for Protection of a Child in an Emergency and Notice of Hearing."

---

[34]Wachsman's signature appeared on page six of the affidavit, as did the notary's signature and stamp.

42

On December 10, 2024—the second day of the termination trial—the Department filed the "Amended Affidavit of Anuki Wachsman." That affidavit included the two seemingly missing pages from the original affidavit, as it included pages one through six.[35] Neither the original affidavit nor the amended affidavit was admitted into evidence at Mother's termination trial.

### 2. Applicable Law

A parent's challenge to the evidentiary basis for removal must be done at the adversary hearing or through the filing of a petition for writ of mandamus after the adversary hearing. *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *1 n.3 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.); *In re M.A.-O.R.*, No. 02-11-00499-CV, 2013 WL 530952, at *4–5 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.). Moreover, a temporary order—such as an order authorizing a child's initial removal—is suspended by the entry of a final termination order, rendering moot any complaint about the temporary order. *In re S.L.*, No. 05-21-00874-CV, 2022 WL 896874, at *3 (Tex. App.—Dallas Mar. 28, 2022, pet. denied) (per curiam) (mem. op.); *In re A.K.*, 487 S.W.3d 679, 683 (Tex. App.—San Antonio 2016, no pet.).

---

[35]The first, third, fifth, and sixth pages of the amended affidavit were the same as the original affidavit, with the exception that the amended affidavit was titled "Amended Affidavit of Anuki Wachsman." Even the page bearing Wachsman's signature and the notary's signature and stamp were the same, reflecting that those affidavits were subscribed and sworn to on December 22, 2023.

### 3. Analysis

Here, any complaint regarding Wachsman's original affidavit supporting Jaden's removal needed to be raised during the adversary hearing or through the filing of a petition for writ of mandamus after the adversary hearing. *See C.Y.*, 2022 WL 500028, at *1 n.3; *M.A.-O.R.*, 2013 WL 530952, at *4–5. But Wachsman's original affidavit was admitted—without any objection being raised—at the March 6, 2024 continuation of the adversary hearing. And Mother did not file a petition for writ of mandamus after the adversary hearing. Instead, the case proceeded, culminating in the five-day termination trial in December 2024. At that trial, neither Wachsman's original affidavit nor Wachsman's amended affidavit was admitted into evidence. Following that trial, the trial court signed a final termination order terminating Mother's parental rights to Jaden.

That final termination order suspended the temporary orders before it, including the order authorizing Jaden's initial removal. *See S.L.*, 2022 WL 896874, at *3; *A.K.*, 487 S.W.3d at 683. Thus, any complaint regarding the evidentiary basis for Jaden's removal or the temporary order authorizing that removal was rendered moot by the final termination order.[36] *See S.L.*, 2022 WL 896874, at *3; *A.K.*, 487 S.W.3d

---

[36]In her brief, Mother does not explain how the missing pages impacted the trial court's termination order, how it prevented her from asserting her rights at trial, or how it denied her the opportunity to litigate any of her defenses. *See Alexander v. Johnson*, No. 14-08-00778-CV, 2010 WL 11201, at *2 (Tex. App.—Houston [14th Dist.] Jan. 5, 2010, no pet.) (mem. op., not designated for publication) ("Extrinsic fraud is wrongful conduct practiced outside of the adversary trial that affects the

at 683; *see also C.Y.*, 2022 WL 500028, at *2 n.3 (holding that mother waived any complaint regarding the evidentiary basis for her child's removal by failing to raise the issue at the initial removal hearing and by failing to challenge the removal order through a petition for writ of mandamus, and holding that, in any event, mother's challenge was rendered moot by the final termination order); *In re J.F.G., III*, 500 S.W.3d 554, 558–59 (Tex. App.—Texarkana 2016, no pet.) (holding that mother's complaint regarding the sufficiency of the evidence to support the initial removal of her child was rendered moot by the trial court's final termination order); *In re Z.R.M.*, No. 04-15-00063-CV, 2015 WL 4116049, at *5 n.5 (Tex. App.—San Antonio July 8, 2015, no pet.) (mem. op.) (holding that mother's complaints about her child's removal were "not proper in the context of an appeal from a final order terminating parental rights").

We overrule Mother's third issue.

---

manner in which the judgment was procured and prevents a litigant from having a fair opportunity to assert his rights at trial."); *In re J.B., Jr.*, No. 2-08-195-CV, 2009 WL 485717, at *2 (Tex. App.—Fort Worth Feb. 26, 2009, no pet.) (mem. op.) (stating that "[e]xtrinsic fraud is fraud that denies a party the opportunity to fully litigate at trial all the rights or defenses that [s]he could have asserted" and that it is "wrongful conduct practiced outside of the adversary trial . . . that affects the manner in which the judgment is procured").

## IV. CONCLUSION

Having overruled Mother's three issues, we affirm the trial court's termination order.[37]

/s/ Dana Womack

Dana Womack
Justice

Delivered:  May 22, 2025

---

[37]We deny all pending motions in this appeal.